**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RANDY KELLEY, et al.** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| | ) | **Case No. 1:21-cv-00056-RAH-SMD** |
| **v.** | ) | |
| | ) | |
| **CHRISTOPHER ENGLAND, in his official capacity as Chair of the State Democratic Executive Committee of Alabama, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPPOSITION TO MOTION TO INTERVENE

Defendants[1] **Christopher England**, in his official capacity as Chair of the State Democratic Executive Committee of Alabama, the **State Democratic Executive Committee of Alabama**, the **Democratic Party of the United States of America**[2] **a.k.a. the Democratic National Committee** and **Jaime Harrison**, in his

[1] Plaintiffs and Defendants, as referred to herein, are the parties listed in the proposed Complaint in Intervention (doc. 3-1) and on the docket. In filing this response, none of the named Defendants waive any available claims or defenses, including, for those that were not parties to the consent decree, that they cannot be properly named as Defendants to claims that allegedly arise under that document.

[2] The "Democratic Party of the United States of America" is not a legal entity separate and apart from the DNC and thus is not a proper defendant. *See* Charter of the Democratic Party of the

official capacity as Chairperson of the Democratic National Committee (collectively, the "Defendants") oppose Plaintiff-Intervenors Randy Kelley and Janet May's (collectively, the "Plaintiffs") Motion to Intervene and Complaint in Intervention (doc. 3).

Because of the long history of the case in which the Plaintiffs seek to intervene, we begin with an introduction that sets the stage of this motion. We then discuss the background of the 2019 amendments to the Bylaws and the historic elections that followed—including the election of the first Black chair of the Alabama Democratic Party and the election of new members of the Alabama State Democratic Executive Committee ("SDEC") chosen by Diversity Caucuses. After assessing that factual context, a salient fact remains: **before the Bylaws were amended in 2019, the SDEC membership was 62.8% Black, just as it is today.**

We then turn to the substantive arguments against the Plaintiffs' motion to intervene in this decades-old case, which fails for two central reasons. First, the Motion to Intervene is untimely. Plaintiffs could have filed their motion at any time after the SDEC adopted the Amended Bylaws on October 5, 2019 but instead waited more than eighteen months. Second, Plaintiffs have not articulated an interest in this

---

United States Art. III, Sec. 1 (The DNC has "general responsibility for the affairs of the Democratic Party between National Conventions.")

litigation that could not be pursued through a separate lawsuit. Governing caselaw requires the denial of the Plaintiffs' motion. We then briefly conclude.

## Introduction

Both the Democratic National Committee and the Alabama Democratic Party are unwaveringly committed to ensuring that the representation of Black Democrats on the membership of the Alabama State Democratic Executive Committee ("SDEC") accurately reflects the percentage of Black Democrats in the Alabama Democratic electorate and the critically important role that Black Democrats play in the Party itself.[3] Nothing about that changed when the SDEC adopted the Amended Bylaws on October 5, 2019. In fact, following the adoption of the Amended Bylaws and the election of new members, Black Democrats occupied the same significant majority (62.8%) of the SDEC seats as they did before the Bylaws were amended. It also resulted in the election of Chairman England, who is the first Black chair of the

---

[3] The Alabama Democratic Party and the Democratic National Committee take very seriously their commitment to full participation of all who wish to join in party affairs. *See* DNC Bylaws, Art. 8, Sec. 2 ("Discrimination in the conduct of Democratic Party affairs on the basis of sex, race, age (if of voting age), color, creed, national origin, religion, economic status, sexual orientation, gender identity, ethnic identity or disability is prohibited, to the end that the Democratic Party at all levels be an open party."); SDEC Amended Bylaws Art. III, Sec. 6(d) ("Each Party committee shall establish standards and rules of procedure to afford affected Democrats, and other individuals who wish to participate as Democrats, full, timely and equal opportunities to participate in all Party affairs, including, but not limited to, decisions concerning the nomination, designation, appointment or election of candidates for Party or public office, formulation of policy, and in the conduct of all other Party affairs, without prejudice or discrimination on the basis of sex, race, age (if of voting age), color, creed, national origin, religion, economic status, sexual orientation, gender identity and expression, ethnic identity or disability.").

SDEC – a historical accomplishment that the Plaintiffs now seek to nullify. These were not aberrational results. Going forward, the Amended Bylaws will ensure that Black Democrats will continue to be guaranteed the same level of super majority representation on the SDEC as they have since 1990. Plaintiffs' allegations that the Amended Bylaws "dilute Black voting strength" and were "adopted with the discriminatory purpose of diluting Black voting strength" are demonstrably false.

## **Factual Background**

### **Original *Hawthorne* Case**

The original case was brought more than 30 years ago, in 1989. As the Report of the Alabama Democratic Party Reform Commission boldly asserted at the time, Alabama was a one-party state: "There can be no doubt that the Democratic Party is the dominant political party in Alabama. It is a fact that in the vast majority of federal, state and local elections, throughout the state, Democratic candidates consistently win." (Report at 6).

Further, Black Democrats were significantly underrepresented in the membership of Democratic Party County Committees and on the SDEC in 1989. Alabama Democrats struggled internally to correct that underrepresentation when the *Hawthorne* case was filed by two Henry County residents on April 17, 1989 on behalf of a class of "all black citizens of Alabama," seeking to challenge the procedures for election and selection of the membership of the State and County

Democratic committees. (*See generally*, original Complaint). In particular, the original plaintiffs sought to challenge a rule change that had been then-recently adopted by the SDEC and introduced by Jack Drake ("the Drake Amendment"), alleging that it was an effort to "limit the number and to reduce the effective political power of black members of the SDEC" by "transferring the power to elect additional black SDEC members from the black community's own political caucuses to a majority white electorate." (original Complaint at ¶¶ 28,29). The original plaintiffs were principally unhappy that the Drake Amendment eliminated three SDEC seats that were previously filled by the Alabama Democratic Conference ("ADC").[4] On April 26, 1989, the original plaintiffs amended their Complaint and added the Democratic Party of the United States as a Defendant. (*See* Amended Complaint).

At the time that the original 1989 action was filed, Black membership on Democratic County Committees and the SDEC was based on the Black population as a percentage of the total population of the state, instead of being based on the percentage of Black voters participating in Democratic primaries. This approach did not properly account for Black voting strength and participation in electing Democrats to office. Part of the Drake Amendment did just that and, when the

[4] The ADC is a Black political organization founded in 1960 and led by Dr. Joe L. Reed since 1979. The ADC is strongly affiliated with the Alabama Democratic Party and refers to itself as the "Black caucus of the Alabama Democratic Party." All the original plaintiffs were members of the ADC. Proposed Intervenor Kelley is Vice Chair of the ADC.

Department of Justice reviewed the Amendment, it allowed that part of the Amendment to stand. The DOJ blocked other portions that violated agreements that gave the ADC the right to appoint twenty-three (23) members of the SDEC.

In July 1989, the ADC asked the DOJ to intervene in *Hawthorne* and to review the Drake Amendment for the required pre-clearance by the DOJ pursuant to the Voting Rights Act. (*Montgomery Advertiser*, July 18, 1989).[5] The DOJ blocked the implementation of the Drake Amendment because it violated previous agreements entered in 1974 and 1983 giving the ADC the right to appoint 23 members of the SDEC. DOJ did not object, however, to the provision basing Black membership on the percentage of Black Alabamians in the total population. (*Montgomery Advertiser*, Dec. 2, 1989; *Anniston Star*, Dec. 3, 1989).

In response to the DOJ's action, the SDEC met and voted to amend the bylaws to increase Black membership by basing the percentage of membership on the percentage of Black voter turnout in the 1990 gubernatorial primary, but retained the provision eliminating the ADC's guaranteed seats on the SDEC. (*Montgomery Advertiser*, Jan. 14, 1990). A 3-judge panel ruled that the 1990 amended bylaws required DOJ pre-clearance under the Voting Rights Act. (*See Hawthorne v. Baker*, 750 F. Supp. 1090 (M.D. Ala. 1990); *Montgomery Advertiser*, Aug. 21, 1990). The

[5] Yet another reminder of how long ago these events took place. *See Shelby County, Ala. v. Holder*, 570 U.S. 529 (2013) (striking down the requirement for DOJ preclearance under the Voting Rights Act).

modified plan was submitted for DOJ pre-clearance in March 1990, and the DOJ stated it had no objection to the plan as modified. *See Hawthorne v. Hurley*, 756 F. Supp. 527, 529 (M.D. Ala. 1990).

On August 20, 1990, a 3-judge panel ruled that the 1990 amended bylaws required DOJ pre-clearance under the Voting Rights Act. (*See Hawthorne v. Baker*, 750 F. Supp. 1090 (M.D. Ala. 1990); *Montgomery Advertiser*, Aug. 21, 1990)). Subsequently, in October 1990, the DOJ notified the SDEC that it had no objection to the January 1990 amendments to the bylaws. *See Hawthorne v. Hurley*, 756 F.Supp. 527, 529 (M.D. Ala. 1990).

On March 9, 1991, Bill Blount was elected Chair of the SDEC over Jack Drake. ADC and Joe Reed led the opposition to Drake and publicly claimed credit for electing Blount. Reed also publicly stated that it was pay-back for the Drake Amendment to the bylaws.

On March 25, 1991, the U.S. Supreme Court dismissed the appeal from the 3-judge panel ruling requiring pre-clearance of the 1990 amended bylaws. *State Democratic Executive Committee of Alabama v. Hawthorne*, 499 U.S. 933 (1991). Both sides claimed victory.

In May 1991, the parties reached a settlement of the *Hawthorne* litigation. On May 23, 1991, the proposed settlement was filed with Judge Thompson. (*Montgomery Advertiser*, May 25, 1991). On July 3, 1991, Judge Thompson held a

fairness hearing on the proposed settlement and a Consent Decree was entered. There were no objections to the settlement. (*Ala. Journal*, July 3, 1991).

The Court's July 3, 1991 Consent Decree required the SDEC Chair to appoint a "Democratic Reform Commission" to review and study party rules for selecting leadership and membership of the SDEC, with the following goals: (1). "Provide full and fair representation for all Democrats in Alabama, including in particular black Democrats;" (2). Increase participation in party affairs at the grass roots level, with particular emphasis on revitalization of county executive committees; (3). Reform and revitalize activities of Democratic committees at all levels better to recruit and support Democratic candidates for office; and (4). Require that at least two of the five Alabama Democratic Party members serving on the DNC must be Black. (doc. 2).[6]

The Consent Decree did not mandate any specific changes to the governance or structure of the SDEC, but instead required that the Chair of the SDEC appoint a Reform Commission that would make recommendations regarding reforms to the

[6] Of course, the July 3, 1991 Consent Decree settling this litigation was the result of a negotiated compromise. According to the Consent Decree:

> There is a disagreement between the parties as to whether there is any liability on the part of the defendants in this action, but the parties have agreed to settle and compromise all aspects of this action, including claims for attorneys' fees, to avoid the risks and further expense of litigation. Nothing in this agreement should be taken as an admission of culpability on the part of the defendants, nor as an admission by the plaintiffs that their action lacked merit.

party process for selecting members of County Committees and the SDEC.[7] The Consent Decree further states:

> The State Democratic Executive Committee shall consider the reforms proposed by the Reform Commission, and it shall adopt those reforms deemed desirable, or, at its discretion, other reforms conforming to the goals set out in paragraph 2 above, in time for the reforms to be implemented not later than the 1994 Democratic primary election.

(*Id.*).[8]

On October 19, 1991, SDEC Chairman Bill Blount appointed the Alabama Democratic Reform Commission. (*Montgomery Advertiser*, Oct. 20, 1991; *Anniston Star*, Oct. 20, 1991). The fifteen-member Reform Commission met nine times over the course of the next two years, including six public hearings, and reported back on August 1, 1993. Among the recommendations of the Reform Commission were the adoption of "an aggressive plan to attract young voters to the [Alabama Democratic] Party" (Report at 25), and the establishment of "a new system of selection of members of the SDEC under which all members will be selected on the basis of free election." (*Id.* at 29).

The legacy of the *Hawthorne* litigation is the requirement that the representation of Black Democrats on the SDEC will always be at least equal to the

---

[7] The proposed Complaint in Intervention appears to suggest that the so-called "Figures Amendment" was adopted by the SDEC as a result of the Consent Decree (doc. 3-1 at ¶¶ 17-23). The Consent Decree does not mention the Figures Amendment, however, and certainly did not require its adoption by the SDEC.

[8] The Plaintiffs do not allege that the DNC membership requirement has not been complied with.

percentage of Black voters in the Alabama Democratic Primary. The Defendants ***are fully committed to that legacy*** and are confident that the October 5, 2019 Amended Bylaws preserve and enhance the participation of all Black Democrats in the governance and leadership of the Alabama Democratic Party.

**The 2019 Reforms**

After Proposed Intervenor Randy Kelley was elected as vice chair and Nancy Worley as chair of the Alabama Democratic Party in August 2018, a group of Alabama Democrats challenged the election through the intra-party administrative dispute resolution process with the DNC. Following an evidentiary hearing, the DNC agreed with the challengers that the election in which Kelley and Worley were chosen was fraught with electoral irregularities and required the SDEC to conduct a new election for chair and vice chair under new Bylaws which were required to comply with the DNC Charter and Bylaws. At the time, the SDEC Bylaws violated several provisions of the DNC Charter and Bylaws by failing to provide for the adequate representation of all Alabama Democrats, including young Democrats and LGBTQ+ Democrats. While the DNC left to the SDEC the way in which compliance was to be achieved, the DNC specifically required pre-approval of those Bylaws by the DNC before they could be voted on at any SDEC meeting. The DNC's Rules and Bylaws Committee ordered that these issues be resolved no later than October 5, 2019.

Kelley and Worley refused to follow the DNC's clear directives and the DNC was forced to strip them of their credentials as DNC members. After months of inaction by Kelley and Worley, more than 50% of the members of the SDEC called an SDEC meeting for October 5, 2019 to enact new Bylaws and schedule a compliant election for chair and vice chair of the Alabama Democratic Party.[9]

At an October 5, 2019 meeting, the SDEC adopted new Bylaws ("the Amended Bylaws"), which had been pre-approved by the DNC to remedy the fatal defects in the previous bylaws. The SDEC also scheduled a meeting for November 2, 2019 to conduct a new election for chair and vice chair. Kelley boycotted the October 5, 2019 SDEC meeting.

The proposed Complaint in Intervention relies on the following language of the SDEC Bylaws as they existed before the October 5, 2019 Amended Bylaws were adopted:

> It is the policy of the SDEC that minority members should be represented on the SDEC in proportion to their presence in the Democratic Electorate of Alabama or in proportion to their presence in the population of Alabama, whichever is greater. The term "Democratic Electorate" of Alabama is defined as being composed of those persons who voted for the Democratic nominee for president in the immediate preceding general election and each succeeding general election for the Democratic nominee for president every four (4) years thereafter. Prior to the organizational meeting to be held in 1990, and at each organizational meeting thereafter, the Chair shall, utilizing whatever expert advice and assistance is necessary, and with the advice and

[9] Party Bylaws permit a majority of the SDEC to call such a meeting.

> consultation of the Vice-Chair for Minority Affairs, determine the percentage of minority voters in the Democratic Electorate and compare that percentage to the percentage of minority members found in the population of Alabama, according to the most recent federal decennial census. The higher percentage shall be selected as the percentage of minority members of the State Committee.

SDEC Former Bylaws Art. III, Sec. 1(a) (2018 ed.). After the Bylaws were amended on October 5, 2019, however, the substance of that section remains unchanged:

> For the SDEC, the percentage, set forth in the AA Plan of each diversity Constituency which is not less than the higher of (A) the percentage nominee in the most recent general election or (B) the percentage that such specific Diversity Constituency is of the State's population as reflected in the most recent data (e.g., American Community Survey) published by the U.S. Census Bureau (said percentages sometimes referred to herein as "the two percentages."). The higher of the two (2) percentages for a particular Diversity Constituency is to be applied to the 210 base membership of the State Committee to determine the number of members of that Diversity Group that should be included in the SDEC. If the number produced by the percentage applied to the 210 is greater than the number of Diversity Constituency among the members elected from the legislative districts, then the difference between the two (2) numbers is the target number of At-Large to be nominated and elected to the State Committee for the Diversity Constituency. The same methodology and calculations are to be applied to the 25 base membership Executive Board, as well as to District, County and Municipal Committees.

SDEC Amended Bylaws Art. V, Sec. 2. *See also* SDEC Bylaws Affirmative Action Plan ("In cooperation with the DNC, the SDEC has determined the demographic composition of African Americans, Hispanics, Native Americans, Asian/Pacific, Youth, LGBTQ+ individuals, and individuals with disabilities and veterans in

Alabama's Democratic electorate or in Alabama's population, whichever is higher.").

In fact, Article III, Section 1 of the 2019 Amended Bylaws incorporates substantially similar language as the pre-amendment version:

> It is the policy of the SDEC that full participation is to be achieved in the membership of the State Committee, Executive Board and other Party committees by ensuring that the number of members of each Diversity Constituency among the membership of each of those bodies is at least equal to the Diversity Goals for each Diversity Constituency as contained in the most recent Affirmative Action Plan. All terms to have the meaning defined herein.
>
> Recognizing the critical role that Black Alabamians continue to play in the Democratic Party, including the very high percentage of votes for Democratic candidate at all levels, the Youth Caucus, LGBTQ+ Caucus and Disabled Persons Caucus (the latter starting 2022) shall make every reasonable effort to ensure that the At-Large candidates each caucus nominates for membership on the State Committee and the Executive Board is in the range of the Diversity Goals established for Black participation on the State Committee.

SDEC Amended Bylaws Art. III, Sec. 1 (2019 ed.). This expressly requires that the Youth, LGBTQ+, and Disabled Persons Caucuses submit nominees for membership on the SDEC that reflect the percentage of Black Alabamians who are members of the Democratic electorate or the state's population, whichever is greater.

On October 9, 2019 and again on October 19, 2019 the DNC expressly told Kelley and Worley that it recognized the October 5 meeting of the SDEC as valid, that the October 5 Amended Bylaws governed the SDEC, and that the meeting

scheduled for November 2, 2019 to elect new SDEC members and hold compliant elections for chair and vice chair would proceed.

The November 2, 2019 SDEC meeting was a watershed moment for the Alabama Democratic Party in terms of diverse participation and turnout. In accordance with the SDEC's Amended Bylaws, meetings of the newly established Diversity Caucuses were held and there was an overwhelming turnout by Diversity Caucus members. The Youth Caucus, Native American Caucus, Hispanic Caucus, Asian and Pacific Islander Caucus, and LGBTQ+ Caucus all met to nominate At-Large members of the SDEC. These At-Large members were unanimously elected as SDEC members. These new SDEC members include historic numbers of young voters who have agreed to participate in party leadership. More than 80% of the Youth Caucus At-Large members are Black and under the age of 36, and more than half of the LGBTQ+ Caucus At-Large members are Black. After seating the new Diversity Caucus members, the percentage of Black members on the SDEC remained at 62.8%; only the percentage of white members decreased.

As he had with the October 5, 2019 meeting, Kelley also boycotted the November 2, 2019 SDEC meeting and the SDEC unanimously voted to remove him and Worley as officers of the Alabama Democratic Party, with more than 170 SDEC members voting. Chairman England was elected as the chair of the SDEC at this meeting. Chairman England's election marks the first time that a Black Democrat

has been elected chair of the Alabama Democratic Party. Chairman England and Vice Chair Pat Todd were subsequently certified by the DNC as the Chair and First Vice Chair of the Alabama Democratic Party and credentialed as DNC members in accordance with the party's internal processes. On November 13, 2019, then-DNC Chairman Tom Perez wrote to Chairman England and Vice Chair Todd confirming the DNC's certification of their election and the validity of the October 5 and November 2 meetings and elections. Alabama Secretary of State John Merrill has also recognized the validity of the November 2, 2019 elections under the October 5, 2019 Amended Bylaws.

**<u>The First Kelley Lawsuit in State Court</u>**

Just weeks after the SDEC adopted the October 5, 2019 Amended Bylaws, Proposed Intervenor Kelley sued Chairman England and others in the Circuit Court of Montgomery County, Alabama, challenging the SDEC's Amended Bylaws. *Alabama Democratic Party, et al. v. Gilbert, et al.*, Case No. 03-cv-2019-000531.

Kelley alleged that he was a rightful officer of the Alabama Democratic Party and that the October 5, 2019 Amended Bylaws were improper and illegitimate.[10] Kelley's Complaint sought a temporary restraining order from the circuit court

---

[10] Kelley's proposed Complaint in Intervention apparently seeks to relitigate his previous claims challenging the legality and procedural propriety of the SDEC's adoption of the Amended Bylaws on October 5, 2019 and the subsequent SDEC elections on November 2, 2019. (doc. 3-1 at ¶¶ 26-36).

enjoining the November 2, 2019 SDEC meeting and election. While the circuit court entered a TRO in favor of plaintiffs, the Alabama Supreme Court reversed the trial court and the historic November 2 meeting of the SDEC proceeded as scheduled. The appeal was subsequently dismissed by the Alabama Supreme Court on January 3, 2020. *See Gilbert v. Alabama Democratic Party*, No. 1190099, 2020 WL 63935 (Ala., Jan. 3, 2020).

Kelley then amended his complaint and requested that the circuit court "[a]djudge and declare that the operative and only current and valid bylaws of the SDEC are those adopted on October 12, 2019," and further requested that the circuit court "[a]djudge and declare that the SDEC bylaws purportedly adopted by Defendants and others on October 5, 2019, are invalid and of no force and effect." (*See* Amended Complaint). Kelley's Montgomery County lawsuit was dismissed by the circuit court for lack of jurisdiction on February 27, 2020. No appeal was taken.

## **Argument**

Defendants oppose the Motion to Intervene in this thirty-year-old case on several grounds. First, the Motion to Intervene is untimely. Plaintiffs could have filed their motion at any time after the SDEC adopted the Amended Bylaws on October 5, 2019 but instead they waited more than eighteen months. Second, Plaintiffs have failed to articulate an interest in this litigation that could not be pursued through a separate lawsuit.

## I. PLAINTIFFS ARE NOT ENTITLED TO INTERVENTION AS OF RIGHT.

Pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure, parties seeking to intervene as of right must show:

> "(1) [their] application to intervene is timely; (2) [they have] an interest relating to the property or transaction which is the subject of the action; (3) [they are] so situated that disposition of the action, as a practical matter, may impede or impair [their] ability to protect that interest; and (4) [their interest] is represented inadequately by the existing parties to the suit."

*Technology Training Associates, Inc. v. Buccaneers Limited Partnership*, 874 F. 3d 692, 695-96 (11th Cir. 2017) (quoting *Stone v. First Union Corp.*, 371 F. 3d 1305, 1308-09 (11th Cir. 2004)). In this case, Plaintiffs fail to satisfy these requirements and the Motion to Intervene based on intervention as of right is due to be denied.

### A. Plaintiffs' Motion to Intervene is Untimely.

"The Supreme Court has held that the timeliness of a motion to intervene is a **threshold factor** that must be satisfied before the other factors should be considered." *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, FL*, 254 F. Appx. 769, 771 (11th Cir. 2007) (citing *NAACP v. New York*, 413 U.S. 345, 365 (1973)) (Emphasis added). In assessing timeliness, a district court must consider the following four factors:

> (1) The length of time during which the would-be intervenor knew or reasonably should have known if his interest in the case before he petitioned for leave to intervene; (2) the extent of prejudice to the

> existing parties as a result of the would-be intervenor's failure to apply as soon as he knew or reasonably should have known of his interest; (3) the extent of prejudice to the would-be intervenor if his petition is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely.

*U.S. v. Jefferson County*, 720 F. 2d 1511, 1516 (11th Cir. 1983). *See also E.E.O.C. v. Foley Products Co.*, 2012 WL 380375, *1 (M.D. Ala. 2012)*; U.S. v. State of Alabama*, 2006 WL 2290716, *6 (M.D. Ala. 2006); *Dillard v. City of Foley*, 166 F.R.D. 503, 505 (M.D. Ala. 1996). "[T]imeliness is not limited to chronological considerations but is to be determined from all the circumstances." *Stallworth v. Monsanto Co.*, 558 F. 2d 257, 263-64 (5th Cir. 1977) (Internal quotations and citations omitted).

The circumstances of this matter and the four factors outlined by the Eleventh Circuit show that Plaintiffs' motion to intervene is untimely.

First, the Plaintiffs knew of their interest in this case as early as October 5, 2019 when the Amended Bylaws were adopted by the SDEC. (*See* Proposed Complaint in Intervention (the "Complaint in Intervention") at ¶ 9). Additionally, Plaintiff Kelley was one of the individuals who filed suit challenging the October 5, 2019 Amended Bylaws in the Circuit Court of Montgomery County, Case No. 03-cv-2019-000531. Plaintiffs were obviously aware of their claims and their interest in challenging the Amended Bylaws at that time, but instead delayed filing until January 19, 2021 without any explanation for the delay. (*Montgomery Advertiser*,

"Judge dismisses lawsuit over Alabama Democratic Party leadership", Feb. 27, 2020).

Second, Plaintiffs seek to intervene into a case that has been closed for thirty (30) years. Plaintiffs have not directed the Court to any precedent for this extraordinary request. The record evidence has gone stale and the parties do not have ready access to the relevant case documents as the docket is not available through PACER. In addition, the memories of the parties who drafted the Consent Decree have likely faded and earlier drafts of the Consent Decree and notes of contemporaneous discussions are likely no longer accessible.[11] Further, on information and belief, at least one of the original plaintiffs to this matter has since passed away. Moreover, it is unclear who the correct parties are in this case and whether certain parties named in the Complaint in Intervention are still parties to the underlying case.[12]

Compounding the problem is that the three-decade old nature of this case means that determining the law of the case will be extremely difficult and time-consuming. In addition, much of the law governing the Plaintiffs' claims has

---

[11] "Because a consent decree is a contract, we follow the rules for interpretation of contracts and apply principles of state contract law." *Peery v. City of Miami*, 977 F.3d 1061, 1069 (11th Cir. 2020).

[12] It was contemporaneously reported that Judge Thompson dismissed the Democratic National Committee as a defendant in January 1990. (*See Montgomery Advertiser*, Jan. 21, 1990).

changed since 1989, making it even more difficult for this Court to determine whether some or all of Judge Thompson's previous rulings might require revisiting.

The Defendants will suffer additional prejudice if Plaintiffs are permitted to intervene in this matter because the Alabama Democratic Party has operated under the Amended Bylaws for the last 18 months.[13] Pursuant to the Amended Bylaws, new members were elected to the SDEC and the Alabama Democratic Party underwent extensive reorganization to accommodate the new leadership structure. The Defendants have relied on the October 5, 2019 Amended Bylaws and Plaintiffs' attempt to invalidate the bylaws at this late date would wreak havoc on the Alabama Democratic Party. This type of prejudicial delay is what the timeliness prong of Rule 24(a)(2) is intended to prevent.

Third, Plaintiffs would not be prejudiced by the Court's denial of their motion to intervene as they can file a separate lawsuit which alleges the same claims as in the Complaint in Intervention. As argued herein, Plaintiffs' claims do not relate to the Consent Decree and should be adjudicated in a separate lawsuit. (*See infra*

[13] During which time the Defendants participated in primary and general elections under operation of the Amended Bylaws. Presumably, any good faith challenge to the October 5 2019 Amended Bylaws necessarily should have occurred well in advance of the November 2020 general election.

Section I (B)). Thus, Plaintiffs will not suffer prejudice if prohibited from intervening in this action.[14]

Lastly, there are no unusual circumstances in this case that would weigh in favor of allowing intervention. In fact, the circumstances of this case weigh against allowing intervention. Specifically, Plaintiff Kelley already attempted to challenge the Amended Bylaws in the Montgomery County lawsuit and was unsuccessful. Now, over a year after the dismissal of that lawsuit, Plaintiffs attempt to challenge the Amended Bylaws again by claiming that they violate the Consent Decree. The circumstances surrounding Plaintiffs' Motion to Intervene weigh against allowing intervention as Plaintiffs' motion is untimely.

### B. Plaintiffs Cannot Articulate a Sufficient Interest in this Matter and Offer No Evidence to Suggest that They are Impeded in Their Ability to Protect That Interest.

Plaintiffs allege two goals in seeking to intervene in this matter: (1) enforce the Consent Decree and (2) challenge the October 5, 2019 SDEC bylaws as violating Section 2 of the Voting Rights Act, the Fourteenth Amendment and the Fifteenth Amendment. (*See* Motion at 3). However, the only stated interest in intervening is that the Plaintiffs, as Black Alabama Democrats, "have an interest in bylaws that provide for the full and fair representation of African Americans on the governing

---

[14] Of course, Defendants contend that Plaintiffs have no viable claims or basis for challenging the Amended Bylaws and will vigorously seek the dismissal of any subsequent action pursued by Plaintiffs.

bodies of the Alabama Democratic Party." (*Id.* at 6). Unquestionably, this interest is shared by all parties – particularly the Alabama Democratic Party and the DNC – but that common interest does not support Plaintiffs' intended goals of enforcing the Consent Decree and challenging the October 5, 2019 Amended Bylaws.

Finally, Plaintiffs fail to identify the particular provision of the Consent Decree that they contend Defendants have violated with the SDEC's adoption of the Amended Bylaws.

**1. Plaintiffs have failed to state a claim to enforce the Consent Decree, which has been fully complied with and remains in effect today.**

The *Hawthorne* Consent Decree remains in effect today and has been complied with at all stages. The Consent Decree settling this litigation was the result of a negotiated compromise and did not mandate any specific changes to the governance structure of the SDEC.[15] Instead, it required that the Chair of the SDEC appoint a "Democratic Reform Commission" to "undertake such work as the Chair of the SDEC may designate, which shall include, though need not be limited to revising the method utilized in Alabama for selecting members of the Democratic National Committee, the State Democratic Executive Committee (including its

[15] *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984) ("[T]he 'scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it' or by what 'might have been written had the plaintiff established his factual claims and legal theories in litigation.'" (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681–682 (1971)).

boards and subcommittees), and all county Democratic executive committees." (Consent Decree at 2-3). The Consent Decree further states:

> The State Democratic Executive Committee shall consider the reforms proposed by the Reform Commission, and it shall adopt those reforms deemed desirable, or, at its discretion, other reforms conforming to the goals set out in paragraph 2 above, in time for the reforms to be implemented not later than the 1994 Democratic primary election.

(*Id*.).

The Alabama Democratic Party has fully complied with the requirements of the Consent Decree. The Chair of the SDEC properly appointed the required Reform Commission in October 1991. The fifteen-member Reform Commission met nine times over the course of the next two years, including six public hearings, and reported back on August 1, 1993. Among the recommendations of the Reform Commission were the adoption of "an aggressive plan to attract young voters to the [Alabama Democratic] Party" (Reform Commission Report at 25), and the establishment of "a new system of selection of members of the SDEC under which all members will be selected on the basis of free election." (*Id.* at 29).

Contrary to the implication in the Complaint in Intervention, neither the Consent Decree nor the resulting Reform Commission Report required the adoption of any specific changes to the SDEC Bylaws and certainly did not require the SDEC to adopt the so-called "Figures Amendment" which is purportedly attached to the Complaint in Intervention. (doc. 3-1 at Exhibit 2). Because the Alabama Democratic

Party complied with the requirements of the Consent Decree, there is nothing further for Plaintiffs to enforce in this action.

**2. Plaintiffs' statutory and constitutional claims are not related to the Consent Decree and should be adjudicated in a separate proceeding.**

As a threshold matter, the Plaintiffs have pleaded claims that fail under Federal law. To maintain claims under Section 2 and the Fourteenth and Fifteenth Amendments, Plaintiffs must allege some sort of state action. *See* 52 U.S.C. § 10301(a); *Cook v. Talladega Coll.*, 908 F. Supp. 2d 1214 (N.D. Ala. 2012). Section 2 specifically states as follows:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied **by any State or political subdivision** in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

52 U.S.C. § 10301(a) (Emphasis added). As to the Constitutional Amendments, the law is clear that the amendments " 'do not apply to private parties unless those parties are engaged in an activity deemed to be 'state action.''" *Cook*, 908 F. Supp. 2d at 1222.

In this case, Defendants are not considered state actors, nor do their actions in adopting the October 2019 Bylaws constitute "state action." The Amended Bylaws challenged by Plaintiffs are the product of intra-party business and cannot be considered state action. *See Max v. Republican Committee of Lancaster County*, 587

F. 3d 198 (3rd Cir. 2009) (declining to elevate internal political party issues to constitutional level); *Smith v. State Exec. Comm. Of Democratic Party of Ga*, 288 F. Supp. 371, 374 (N.D. Ga. 1968) (holding head of state party's actions did not constitute state action); *Valenti v. Pennsylvania Democratic State Committee*, 844 F. Supp. 1015, 1018 (M.D. Pa. 1994) (holding that "the conduct of party leaders involving the internal affairs of the party is not state action."); *Blank v. Heineman*, 771 F. Supp. 1013, 1018 (D. Neb. 1991) (holding plaintiffs' argument that "actions relating solely to internal activity of a political party" constitutes state action is unpersuasive). "Simply stated, the plaintiffs' argument, carried to its logical extension would transform *any* action of a political party involving internal affairs into state action." *Blank*, 771 F. Supp. at 1018. Thus, Plaintiffs cannot state a claim for relief under Section 2 and the referenced amendments as there is no state action in this case.

Even if this Court determined that Section 2, the Fourteenth Amendment, or the Fifteenth Amendment applied, any dispute over the Amended Bylaws is not related to the Consent Decree and should be adjudicated in a separate matter. Plaintiffs' claims involve different parties than the parties to the Consent Decree. Necessarily, the Chairman of the SDEC, the members of the SDEC, the Chairman of the DNC and the members of the DNC are different than the parties originally sued in 1989. Moreover, the facts relied upon by Plaintiffs in bringing the Section 2

claim and claims based on the referenced amendments are vastly different than the original facts in this case. Plaintiffs' claims will require a new record, new discovery and would essentially be a new lawsuit. Therefore, Plaintiffs' claims should be adjudicated – if at all – in a new, separate lawsuit and the Consent Decree should remain undisturbed by this late-arriving attempt to tie the Plaintiffs' new litigation to the decades-old *Hawthorne* case.

## II. PLAINTIFFS ARE NOT ENTITLED TO PERMISSIVE INTERVENTION.

"Permissive intervention under Fed. R. Civ. Proc. 24(b) is appropriate where a party's claim or defense and the main action have a question of law or fact in common and the intervention will not unduly prejudice or delay the adjudication of the rights of the original parties." *Georgia v. U.S. Army Corps of Engineers*, 302 F. 3d 1242, 1250 (11th Cir. 2002). Plaintiffs have failed to meet this standard and should not be permitted to intervene in this matter.

Undisputedly, there are no questions of fact in common. This lawsuit was filed in 1989 and the Consent Decree entered in 1991. Plaintiffs now challenge the adoption of bylaws that were not created until 2019. The facts underlying Plaintiffs' claims are undeniably different than the facts underlying the claims originally asserted in 1989. Moreover, there are no questions of law in common.

This Court has broad discretion to permit or deny permissive intervention. *See Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) ("The district court has the discretion to deny intervention even if both of those [Rule 24(b)(2)] requirements are met, and its decision is reviewed for an abuse of discretion."); *Black Warrior Riverkeeper, Inc. v. Alabama Dept. of Transp.*, No. 2:11–CV–267–WKW, 2013 WL 1197010, at *2 (M.D. Ala. Mar. 25, 2013) ("The court has the discretion to deny permissive intervention even if both of those requirements are met.").

In the context of this thirty-year-old case and the circumstances presented by Plaintiffs' challenges to the Amended Bylaws adopted in 2019, this Court should exercise that discretion in favor of declining Plaintiffs' request to intervene.

Respectfully submitted,

*/s/ Barry A. Ragsdale*
Barry A. Ragsdale
Meghan S. Cole

**Counsel for Christopher England, as Chair of the State Democratic Executive Committee of Alabama and the State Democratic Executive Committee of Alabama**

**OF COUNSEL:**
**SIROTE & PERMUTT, P.C.**
2311 Highland Avenue South
P.O. Box 55727
Birmingham, Alabama 35255-5727
Tel.: (205) 930-5100
bragsdale@sirote.com
mcole@sirote.com

*/s/ Anil A. Mujumdar*
Anil A. Mujumdar

**OF COUNSEL:**
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, Alabama 35206
Tel.: (205) 635-4462
anil@dagneylaw.com

*/s/ Elisabeth C. Frost*
Elisabeth C. Frost
Marc E. Elias

**OF COUNSEL:**
**PERKINS COIE, LLP**
700 14th Street NW
Washington, D.C. 20005
Tel.: (202) 654-6200
efost@perkinscoie.com
melias@perkinscoie.com

*/s/ Sarah R. Gonski*
Sarah R. Gonski

**OF COUNSEL:**
**PERKINS COIE, LLP**
2901 N. Central Avenue
Phoenix, Arizona 85012
Tel.: (602) 351-8000
sgonski@perkinscoie.com

**Counsel for the Democratic National Committee and Jaime Harrison, as Chair of the Democratic National Committee**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will give notice of such filing to the following:

Fred F. Bell
Fred Bell, Attorney at Law
1015 South McDonough Street
Montgomery, Alabama 36104
ffbell@netzero.com

Bryan L. Sells
The Law Office of Bryan L. Sells LLC
P.O. Box 5493
Atlanta, Georgia 31107
bryan@bryansellslaw.com

*/s/ Barry A. Ragsdale*
OF COUNSEL