IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| RANDY KELLEY, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:21-cv-56-RAH-SMD |
| ) | [WO] |
| JAIME HARRISON, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM OPINION AND ORDER**

This matter was filed after the bylaws of the State Democratic Executive Committee of Alabama (SDECA) were amended and restated during a special party meeting on October 5, 2019. Plaintiffs Randy Kelley and Janet May claim the bylaws violate a Consent Decree from 1991, Section 2 of the Voting Rights Act of 1965 (VRA), 52 U.S.C. § 10301, and the Fourteenth and Fifteenth Amendments to the United States Constitution because, they say, the bylaws dramatically reduced the influence of the Black minority caucus of the SDECA and eliminated the minority caucus's ability to select all at-large members to the SDECA. Plaintiffs name as defendants: the National Democratic Committee; the SDECA; Christopher England, Chair of the SDECA; and Jaime Harrison, Chair of the Democratic National Committee.

1

The Defendants move for dismissal on two grounds: (1) because the Plaintiffs' allegations, if assumed true, do not violate the plain terms of the Consent Decree, and (2) because there is no state action to support a VRA or constitutional violation.

After reviewing all the relevant filings, and having had the benefit of oral argument, the Court concludes that both of Defendants' arguments are correct, and that the Motion to Dismiss (Doc. 59) is due to be granted.

## I. MOTION TO DISMISS STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8 of the Federal Rules of Civil Procedure, which requires: "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A "formulaic recitation of the elements of a cause of action" does not meet this requirement. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court must take "the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[D]etermining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." *Id.* at 663–64. But if the facts in the complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief,'" and the complaint must be dismissed. *Id.* at 679 (citing Fed. R. Civ. P. 8(a)(2)).

## II. JURISDICTION AND VENUE

The Court has subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331. Venue is uncontested and lies properly in the Middle District of Alabama.

## III. BACKGROUND

In 1991, this Court entered a Consent Decree that settled litigation involving the participation of Black Democrats within the Alabama Democratic Party. (*See* Doc. 2.) The primary focus of the Consent Decree was the creation of a reform commission which would make recommendations for the SDECA to adopt. With its charge, the reform commission ultimately made recommendations that the SDECA adopted via the Figures Amendment (*see* Doc. 47 at 24–31) which included, among

others, the ability of the minority caucus to select at-large members for the purpose of increasing minority membership on the SDECA to a level proportionate to either the percentage of Black voters who participated in the state democratic gubernatorial primary election or to the percentage of minorities in the state's population according to the most recent census.

While these reforms appear to have increased the membership of Black Democrats on the SDECA, such participation did not mean that all remained well and good within the SDECA. In more recent years, disputes have arisen between factions within the SDECA and the Democratic National Committee concerning the future direction of the Alabama Democratic Party and its long-time leadership by Nancy Worley and Joe L. Reed.

Those disputes culminated in the adoption of amended and restated bylaws during an October 5, 2019 SDECA meeting. Among others, the amended and restated bylaws changed the way the SDECA elected at-large members by shifting the power to elect at-large members solely from the Black minority caucus to the SDECA as a whole. (Doc. 47 at 12.) The bylaws also created six additional diversity caucuses, including those for young members, Hispanic members, LGBTQ+ members, Asian/Pacific Islander members, Native American members, and members with disabilities.

Shortly after the adoption of those bylaws, new leadership of the SDECA was elected, including Christopher England as Chair, who replaced long-time Chairwoman Nancy Worley, and Patricia Todd as Vice-Chair, who replaced Vice-Chair Randy Kelley. That same leadership remains in place today.

This lawsuit followed, after a state court lawsuit was filed in the Circuit Court of Montgomery County, Alabama and was later dismissed.

## IV. DISCUSSION

### A. The Alleged Violations of the Consent Decree

In Count I, Plaintiffs contend that the amended and restated bylaws "violate the consent decree in this case by reducing the influence of the Committee's existing minority caucus and by shifting control over the selection of at-large members of the minority caucus to the Committee's elected members." (Doc. 47 at 14.) Defendants reply that the Plaintiffs point to no enforceable provision of the Consent Decree that has been violated by any Defendant, and therefore the Defendants move for dismissal of Count I for failure to state a claim.

To begin, consent decrees are interpreted and enforced according to their unambiguous terms. "[L]ong standing precedent evinces a strong public policy against judicial rewriting of consent decrees. '[A] district court may not impose obligations on a party that are not unambiguously mandated by the decree itself.'" *Reynolds v. Roberts*, 207 F.3d 1288, 1300 (11th Cir. 2000) (quoting *King v. Allied*

5

*Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995)) (some alterations in original). As the Supreme Court has held:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. **For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.**

*United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971) (emphasis added); *see also United States v. ITT Cont'l Baking Co.,* 420 U.S. 223, 233 (1975) ("[A]ny command of a consent decree or order must be found within its four corners, and not by reference to any purposes of the parties or of the underlying statutes"); *United States v. Atl. Ref. Co.,* 360 U.S. 19, 23 (1959) (rejecting a loose interpretation of the consent decree even though such an interpretation might better effectuate the purposes of the acts allegedly violated); *Hughes v. United States,* 342 U.S. 353, 356–57 (1952) (rejecting an invitation to advance the asserted purpose of the consent decree through an interpretation of a consent decree not justified by the four corners of the decree); *Sierra Club v. Meiburg*, 296 F.3d 1021, 1032 n.11 (11th Cir. 2002)

6

("In the case before us, the district court used what is considered to be the purpose of the decree to interpret expansively the decree's terms. That should not be done.").

Consent decrees are judicially embraced contracts, as they include negotiated terms and are interpreted and construed according to the rules for construing contracts. *See Peery v. City of Mia.*, 977 F.3d 1061, 1069 (11th Cir. 2020) ("Because a consent decree is a contract, we follow the rules for interpretation of contracts and apply principles of state contract law."). Because consent decrees operate as a contract, to sufficiently plead a breach or violation of a consent decree, a plaintiff must identify those terms of the consent decree that have been purportedly breached to proceed on the claim. *See Estate of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020) ("[Plaintiff] only 'generally asserted' a breach of contract, without identifying 'any provisions or any specific agreements that were breached . . . .' [T]his was insufficient to state a claim because [plaintiff] has not alleged any general or specific provision of any contract that [defendant] might have breached").

Against this backdrop, the Defendants argue that the Plaintiffs fail to identify a single provision of the Consent Decree that the amended bylaws violate. At oral argument, the Court specifically asked Plaintiffs' counsel to identify the provisions that have been violated. When pressed, the Plaintiffs referenced three parts of the Consent Decree that were allegedly violated by the Defendants through passage of the amended and restated bylaws: paragraphs 2, 4, and 7. Each is discussed in turn.

Paragraph 2 of the Consent Decree outlines the duty of the reform commission to "undertake such work" as designated by the Chair of the SDECA which "shall include" revising the methods utilized in Alabama for selecting members of the various Democratic executive committees in Alabama with the goal of providing "full and fair representation for all Democrats in Alabama, including in particular black Democrats." (Doc. 47 at 21–22.)  Paragraph 2 creates no other obligation.

While the Plaintiffs argue that their Complaint in Intervention sufficiently alleges a violation of paragraph 2, it does not.  Indeed, nowhere does the Complaint allege that the reform commission failed to undertake any work designated by the Chair of the SDECA, including that work necessary to revise the methods of selecting committee members. A plain reading of paragraph 2 reveals that a violation could only exist, for example, if the reform commission refused to undertake those tasks directed by the Chair. But that is not the factual circumstance alleged in the Complaint.

Instead of focusing on whether the reform commission followed its obligations under paragraph 2, the Plaintiffs take a detour.  In their briefs and again at oral argument, the Plaintiff repeatedly refer to the "goals" (or purposes) that are referenced in paragraph 2 as driving their contention that the amended bylaws violate the Consent Decree.  However, "the Supreme Court has observed that consent decrees generally do not have overarching purposes which can be used as guides to

interpretation." *Sierra Club v. Meiburg*, 296 F.3d 1021, 1031–32 (11th Cir. 2002) (citing *United States v. Armour & Co.,* 402 U.S. 673, 682 (1971)); *see also United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 235 (1975) ("[I]t is inappropriate to search for the 'purpose' of a consent decree and construe it on that basis."). As such, any cited goals or purposes referenced in the Consent Decree cannot serve as a basis for alleging a violation of the Consent Decree. In sum, the Plaintiffs do not allege any facts amounting to a violation of paragraph 2 of the Consent Decree.

The Court cannot find any facts supporting a violation of paragraph 4 of the Consent Decree either. Paragraph 4 states that the SDECA "shall consider reforms proposed by the Reform Commission, and shall adopt those reforms deemed desirable, or at its discretion, other reforms conforming to the goals set out in paragraph 2 . . . ." (Doc. 47 at 22.) But the Complaint here alleges no failure by the SDECA to consider any reforms proposed by the reform commission. So again, the Complaint's factual allegations do not evidence a violation of paragraph 4 of the Consent Decree.

Paragraph 7 draws the Plaintiffs' primary focus. Still, the Court cannot find any allegations supporting a violation of that paragraph either. Paragraph 7 is primarily an enforcement provision, stating that civil actions may be brought to enforce the terms of the Consent Decree and that the Consent Decree's terms are "permanent and binding." (Doc. 47 at 23.) Paragraph 7 merely provides a vehicle to

9

enforce the obligations contained in other sections of the Consent Decree and clarifies that the plaintiffs are not prevented from suing the defendants for committing future violations of the Consent Decree or the law.  Like the other referenced paragraphs, nothing in the Complaint supports a violation of paragraph 7. That Plaintiffs have been afforded the right to intervene and file this suit bears evidence that paragraph 7 has not been violated by the new amendments and bylaws.

     Moreover, pertinent to the Consent Decree as a whole, the goals language relied on by Plaintiffs does not and cannot expand the terms of the Consent Decree beyond those provided within the four corners of the Consent Decree itself. The Plaintiffs appear to do this very thing when they repeatedly reference the minority caucus and the need to preserve its influence and sole power to select at-large members via the Figures Amendment that did not even exist at the time of the Consent Decree. And from a goals standpoint, the Plaintiffs' assertions about violations of the goals of the Consent Decree find little support, as the Plaintiffs' assertions, on their face, seem to run counter to the SDECA's stated goal of increasing diversity on the SDECA.[1]

---

[1] The stated "goals" in the Consent Decree were to provide full and fair representation for *all* Democrats in Alabama, including Black Democrats, to increase participation in party affairs at the grass roots level, and to reform and revitalize activities of Democratic committees at all levels. The Court struggles to see where the amended bylaws violate any of these goals.  For all practical purposes, the amended bylaws appear to further those goals through the creation of additional diversity caucuses and the ability of the SDECA as a whole, including all caucuses, to select at-large members.

Finally, to the extent Plaintiffs argue that the amended bylaws violate the Consent Decree by changing bylaws that were the product of the Reform Commission, they are mistaken. Although the Consent Decree mandates that the SDECA "shall consider the reforms proposed by the reform commission" and "adopt those reforms deemed desirable," it does not preclude the SDECA from making future changes to the bylaws regarding the methods of selecting at-large members of the SDECA. In fact, the Consent Decree explicitly gives the SDECA the authority to adopt "at its discretion, other reforms conforming to the goals" set out in the Consent Decree regarding the full and fair representation of all Democrats.

Simply put, having examined the Complaint allegations against the Consent Decree, the Court finds no factual allegation that could support a violation of any term of the Consent Decree. Therefore, the Court concludes that Count I fails to state a claim and is due to be dismissed.

### B. The Complaint Allegations Do Not Allege State Action[2]

---

[2] Plaintiffs allege a finding of state action is compelled by the *law of the case* doctrine. However, as Defendants argue, "[t]he law of the case does *not* apply to a finding that is later vacated. Where a judgment is vacated for a new determination, findings previously made that are integral to that judgment are likewise vacated and are thus not subject to the law of the case doctrine." *Dorsey v. Cont'l Cas. Co.*, 730 F.2d 675, 678 (11th Cir. 1984) (citing *Johnson v. Bd. of Educ. of Chi.*, 457 U.S. 52 (1982)) (emphasis in original). The judgment on which the Plaintiffs rely was vacated and remanded with directions to dismiss by the United States Supreme Court. *See Hawthorne v. Baker*, 750 F. Supp. 1090, 1092 (M.D. Ala. 1990), *vacated sub nom. State Democratic Exec. Comm. of Ala. v. Hawthorne*, 499 U.S. 933 (1991). Accordingly, the *law of the case* doctrine has no bearing on this case.

In Counts II and III, the Plaintiffs allege that the amended bylaws "dilute Black voting strength in violation of Section 2 of the Voting Rights Act of 1965" and "were adopted with the discriminatory purpose of diluting Black voting strength in violation of Section 2 of the Voting Rights Act of 1965," and the "Fourteenth and Fifteenth Amendments to the United States Constitution." (Doc. 47 at 14.) Defendants' counter is simple. They argue that, to maintain claims under either the VRA or the Constitution, the Plaintiffs must show state action, and that here, the Plaintiffs' disputes concern internal party affairs, not state action. The Court agrees with the Defendants.

To be sure, to maintain claims under Section 2 of the VRA and the Fourteenth and Fifteenth Amendments, there must be some sort of state action. *See* 52 U.S.C. § 10301(a); *Cook v. Talladega Coll.*, 908 F. Supp. 2d 1214, 1222 (N.D. Ala. 2012). The Amendments "do not apply to private parties unless those parties are engaged in an activity deemed to be state action." *Cook*, 908 F. Supp. 2d at 1222 (quoting *Farese v. Scherer*, 342 F.3d 1223, 1233 n.13 (11th Cir. 2003)) (internal quotation marks omitted). In other words, private individuals and entities are not normally liable for violations of rights secured by the United States Constitution, or with the VRA.

To constitute state action for a constitutional violation, a plaintiff bears the burden of showing that the actions complained of are "fairly attributable" to the

government. *Rendell–Baker v. Kohn,* 457 U.S. 830, 838 (1982). Three primary tests exist: the "symbiotic relationship" test, the "state compulsion" test, and the "public function" test. *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725 (1961) (outlining that the symbiotic relationship test or joint participant test asks whether "[t]he State has so far insinuated itself into a position of interdependence with [the organization] . . . that it must be recognized as a joint participant in the challenged activity."); *Blum v. Yaretsky,* 457 U.S. 991, 1004 (1982) (holding that the "state compulsion" test requires that a state "exercis[e] coercive power or . . . provid[e] such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."); *Rendell–Baker*, 457 U.S. at 842 (holding that for satisfaction of the "public function" test, the entity must perform a function that is "traditionally the exclusive prerogative of the state.").

Plaintiffs do not explicitly assimilate the allegations in the Complaint into any of the three tests for determining state action. Instead, Plaintiffs rely on cases that have held that conducting primary elections constitutes state action. *See, e.g.*, *Terry v. Adams*, 345 U.S. 461, 469–70 (1953) (holding that a private political association's primary election constituted state action); *Smith v. Allwright*, 321 U.S. 649, 663–64 (1944) (finding party primaries an essential component of the electoral process, and thus state action). But the allegations in this case do not directly implicate the administration of primary elections.

13

Rather, the Complaint's allegations concern internal organizational bylaws. Other courts have found that processes relating to bylaws and their amendments are inherently operational in nature, not electoral nor governmental. *See Mulvihill v. Julia L. Butterfield Mem'l Hosp.*, 329 F. Supp. 1020, 1024 (S.D.N.Y. 1971) (finding that where the state did not approve a hospital's internal bylaws and no state nominee sat on the hospital's board of trustees, the state was not so associated with the conduct of private hospital that hospital's action in discharging doctors without hearing could constitute state action). *See also Banchy v. Republican Party of Hamilton Cnty.*, 898 F.2d 1192, 1196 (6th Cir. 1990) (asserting that the election of a party ward chairman did not represent state action because there was no evidence that chairman engaged in a government function); *Kay v. N.H. Democratic Party*, 821 F.2d 31, 33 (1st Cir. 1987) (holding that political candidate has no right of access to political party's presidential candidate forum since "in holding the forum, the Party was not engaged in governmental activity"); *McMenamin v. Phila. Cnty. Democratic Exec. Comm.*, 405 F. Supp. 998, 1003 (E.D. Pa. 1975) ("[T]he filling of [a party office] is not state action or action under color of state law.").

Indeed, courts generally view political organizations as private organizations when performing internal party business. *See, e.g.*, *Republican Party of Tex v. Dietz*, 940 S.W.2d at 92–93 (Tex. 1997) (distinguishing party platforms as beyond the electoral sphere and thus outside the realm of state action where state election laws

14

did not mandate or regulate platforms); *Cal. Republican Party v. Mercier,* 652 F. Supp. 928, 934 (C.D. Cal. 1986) ("The primary election cases do not hold that a political party is part of the state, or that any action by a political party other than conducting an election is state action. . . . The primary election cases merely hold that conducting an election is a governmental function and constitutes state action, no matter who actually conducts the election.").

The dispositive question here is whether the case involves a primary election or internal affairs. There is little doubt that it is the latter. The Plaintiffs' disputes do not concern how a primary election is conducted. They concern the ability and power to select at-large members to a private group's executive committee. That those members ultimately may have some potential influence on who is eventually chosen as the party nominee is far too strained and tenuous to constitute those types of actions involving primary elections that have given rise to state action.[3]

The Court therefore concludes that the Complaint fails to show state action for purposes of supporting violations of the VRA and the Constitution, and thus, the motion to dismiss Counts II and III of the Complaint is due to be granted.

---

[3] Even if delegate selection could constitute state action, the amended bylaws do not violate the Constitution or the VRA because the amended bylaws effectuated "[t]he Party's attempt to broaden the base of public participation in and support for its activities." *Bachur v. Nat'l Democratic Party*, 836 F.2d 837, 842 (4th Cir. 1987) (holding the Equal Division Rule, which mandates gender-balanced delegations at national conventions, is not violative of the Fourteenth Amendment) (quoting *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986)).

## V.   CONCLUSION

None of the three counts in the Complaint in Intervention state a claim upon which relief can be granted. Accordingly, it is

**ORDERED** that the Defendants' Motion to Dismiss (Doc. 59) is GRANTED pursuant to Federal Rule of Civil Procedure 12(b)(6).

**DONE and ORDERED**, on this the 22nd day of June, 2022.

                                            /s/ R. Austin Huffaker, Jr.
                                    R. AUSTIN HUFFAKER, JR.
                                    UNITED STATES DISTRICT JUDGE